UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 07-0051 (RMU) |
| | ) | |
| PARTHASARATHY SUDARSHAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT PARTHASARATHY SUDARSHAN'S MOTION FOR PERSONAL
ACCESS TO CLASSIFIED INTERCEPTS, OR, IN THE ALTERNATIVE,
FOR PRETRIAL CONFERENCE UNDER CLASSIFIED INFORMATION
<u>PROCEDURES ACT SECTION 2</u>**

Defendant Parthasarathy Sudarshan, through counsel, respectfully moves for an order

allowing him to have personal access to documents produced by the United States to his counsel,

and to allow his counsel to discuss with him the same documents.  In the alternative, Defendant

respectfully requests a pretrial conference under Section 2 of the Classified Information

Procedures Act, 18 U.S.C. App. ("CIPA"), at which the Court may address issues relating to

pretrial discovery by the defense of evidence containing classified information.

Of immediate concern is the government's refusal to allow Mr. Sudarshan to listen to and

confer with counsel about what are estimated to be more than 10,000 recordings of telephone

calls intercepted from Defendant's home, office, or cell phone by the government.  Despite the

fact that these intercepted calls are admittedly discoverable under Rule 16, the FBI has refused to

allow the Defendant personal access to the intercepts, or to allow Mr. Sudarshan's counsel even

to discuss the intercepts with the Defendant.

The government has taken these positions despite the fact that Mr. Sudarshan himself was

a party to many of the calls, and despite the fact that the FBI months ago declassified more than

300 intercepts of the same type that the government appears to believe are helpful to its case. The FBI nevertheless insists that the Defendant be denied all access to the contents of intercepted communications in which he and his co-defendants participated on the ground that (1) the FBI has declared the intercepts to be classified (for as yet unknown reasons) and (2) the Defendant does not have a security clearance.[1]  The government has adhered to the FBI's position, and the Protective Order recently executed by counsel for the parties and submitted to the Court specifically forbids defense counsel's sharing any classified information with Mr. Sudarshan. Proposed Protective Order ¶15.[2]

The government has not disputed the tapes' discoverability under Rule 16(a)(1), and in fact has agreed to produce all the intercepts to Defendants' counsel.  A large number of the intercepted conversations, however, are likely to be in the Tamil language.  None of Mr. Sudarshan's defense counsel speak Tamil, and the cost of translating thousands of intercepts without preliminary review of their contents is prohibitive.  For the defense to have meaningful access to this evidence, Mr. Sudarshan must be able to listen to the recordings and direct his counsel to those that are meaningful for his defense.  Otherwise, defense counsel's view of any Tamil-language evidence will be restricted only to those intercepts selected by the government. Similarly, this case involves the purchase and sale of complex electronic components under complicated export regulations.  To the extent the intercepted conversations are concerned with these transactions, counsel requires guidance from the Defendant to understand their significance

---

[1] *See* Letter dated Oct. 12, 2007 from AUSA Jay I. Bratt to William T. Hassler, at 1 (Ex. 1 hereto) (stating that "the FBI's National Security Law Branch ('NSLB') ... will not declassify the phone intercepts that are currently classified and ... will not permit anyone who does not have a security clearance to have access to them").

[2] The proposed Protective Order reserves the Defendant's ability to seek modifications from this Court.  Protective Order ¶20.

and context.  The government to date, however, has refused to agree to allow Mr. Sudarshan's counsel to have such communications with their client.

## I.    FACTUAL BACKGROUND

This case involves allegations that the Defendant exported certain electronic components in violation of United States export regulations.  Also alleged is a conspiracy to export restricted items.

The government notified the defense by filing dated March 23, 2007, of its intent to use information derived from electronic surveillance conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA"), as amended.  On June 1, 2007, the government produced a disk labeled "Cirrus Phone Calls," containing 357 intercepted phone calls that the government may use in its case-in-chief.  These calls are a subset of the larger universe of all FISA intercepts obtained by the government during its investigation.  The FBI has elected to declassify this limited subset of calls, presumably at the request of the government.  The FBI, however, has declined to declassify or otherwise make available to the Defendant himself the vast majority of intercepted calls, which are believed to number more than 10,000 in all.

Many of the declassified calls are in the Tamil language, and the government has represented that a significant number of the calls that remain classified are also likely to be in Tamil.[3]  Similarly, many of the declassified calls are intercepted communications of the Defendant himself, and a significant number of the calls that remain classified are likely to be calls in which the Defendant personally participated.

During September and October, counsel for the Defendant conferred with counsel for the government in an effort to determine if a mutually agreeable method could be found to allow

---

[3] The defendant was born in India.  Tamil is his native language.

review of all intercepted conversations—classified and declassified—by the Defendant. Those

discussions were unfruitful, and culminated with the government's letter of October 12, in which

the prosecution reported that the FBI had declined to allow anyone without a security clearance

(such as Mr. Sudarshan) to have access to the remaining thousands of calls, or to allow defense

counsel to discuss the intercepted calls with such a person (such as the Defendant).[4]

On October 29, 2007, the government submitted a motion for Protective Order as

provided in § 3 of CIPA. The government's draft Order specifically provides that "Defendant

Sudarshan, not being authorized to receive classified information, is excluded from access to

classified information." Proposed Order, ¶ 15. In practice, this restriction means that Defendant

may not listen to intercepted calls himself, and that his counsel may not discuss what they learn

from such calls with the Defendant.[5]

As set forth in the proposed Protective Order, the government has agreed to allow

defense counsel who have received clearance access to the remaining classified recordings.

Selected counsel for Mr. Sudarshan received their clearances on October 23, 2007. They have

not yet had an opportunity to review any of the classified intercepts that are at issue in this

motion, pending entry of the pending Protective Order. Under the currently proposed Protective

Order, defense counsel will be unable to discuss the calls with Mr. Sudarshan, who lacks a

clearance (and is unlikely to obtain one while the current charges are pending).

---

[4] *See* Ex. 1.

[5] The Defendant has agreed to immediate entry of the initial Protective Order so that his counsel may begin their review of the English-language intercepts that the government is willing to make available to counsel. Defendant's agreement to entry of the Protective Order was specifically conditioned on the Order's recognition that Defendant may seek to modify the Order by the filing of a motion such as the current one.

## II.     ARGUMENT

### A.     The Recorded Intercepts Are Discoverable Under Rule 16 and *Brady*

"The language and the spirit of [Rule 16(a)] are designed to provide to a criminal defendant, in fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case."[6] Federal Rule of Criminal Procedure 16(a)(1)(B)(i) requires the government to disclose "any relevant written or recorded statement by the defendant" within the government's possession, custody or control. Similarly, Rule 16(a)(1)(E)(i) requires the disclosure of evidence within the government's possession that is "material to preparing the defense."[7] For a defendant's own recorded statements, the required showing of relevance is minimal: "Generally speaking, the production of a defendant's statements has become 'practically a matter of right even without a showing of materiality.'"[8] Even for recorded intercepts other than the Defendant's own statements, the intercepts are material to the preparation of the defense for the reasons discussed in Section B, below. Where the indictment alleges the Defendant was engaged in a criminal conspiracy, a body of years' worth of intercepted recordings from the Defendant's own telephones, which are likely to contain the recorded statements of alleged co-conspirators (whether charged or uncharged, named or unnamed) during the relevant time frame, are obviously highly relevant materials which it is necessary for defense counsel to able to evaluate.

The intercepted recordings from Mr. Sudarshan's telephones thus fall squarely within discovery available under Rule 16. The government does not appear to contend otherwise; it

---

[6] *United States v. Libby*, 429 F. Supp. 2d, 1, 5 (D.D.C. 2006) (*quoting United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989)).

[7] *Libby*, 429 F. Supp. 2d at 5.

[8] *United States v. Yunis*, 867 F.2d 617, 621-22 (D.C. Cir. 1989) (*quoting United States v. Haldeman*, 559 F.2d 31, 74 n.80 (D.C. Cir. 1976) (en banc)).

agrees that Mr. Sudarshan's lawyers, once they have obtained security clearances, should have access to the recordings.  As discussed herein, however, defense counsel's access to the recordings will not be meaningful, and counsel will be unable to use the recordings to prepare Mr. Sudarshan's defense, unless counsel may have Mr. Sudarshan's assistance in listening to, translating, and evaluating the significance of the recorded conversations.[9]  *See* Section III, *infra*. If statements are discoverable under Rule 16, the Court should order their production unless the government shows cause for deleting or modifying its discovery responses under Rule 16(d)(1) and CIPA §4.[10]

**B.     The Recorded Intercepts Are Material to the Defense**

Where the government seeks to avoid disclosure of classified information, the Court inquires beyond minimal relevance, to determine whether the classified information sought "is relevant *and* helpful to the defense of [the] accused."[11]  The burden is on the government to make a showing sufficient to justify deletion or substitution of discoverable information under CIPA §4.  Here, counsel for the Defendant has not yet had access to the classified intercepts at

---

[9] Similarly, under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the government must disclose any potentially exculpatory information contained in the intercepted recordings.  In the present case, Defendant has requested *Brady* evidence from the government, which encompasses the classified recordings at issue.  Although the government has stated its intention to comply fully with *Brady*, a procedure where counsel cannot understand *Brady* material produced in a foreign language or where counsel cannot discuss with the Defendant *Brady* material produced renders this basic right meaningless.

[10] *See United States v. Giffen*, 379 F. Supp. 2d 337, 343 (S.D.N.Y. 2004) (determining discoverability, and leaving CIPA issues to be addressed in subsequent CIPA motions practice), *appeal dismissed*, 473 F.3d 30 (2d Cir. 2006); *see also United States v. Libby*, 429 F. Supp. 2d 18, 21-26 (D.D.C. 2006) (recognizing CIPA issues to be decided in forthcoming proceedings on government's motion under CIPA).

[11] *Yunis*, 867 F.2d at 622 (*quoting Roviaro v. United States*, 353 U.S. 53, 60-61 (1957)); *accord United States v. Mejia*, 448 F.3d 436, 456 (D.C. Cir. 2006).  Any such showing of materiality would necessarily subsume the lesser showing of materiality required for evidence to be discoverable under Rule 16(a)(1)(E) in the non-CIPA context.  *See, e.g., Libby*, 429 F. Supp. 2d at , 7-8, 11-16 (D.D.C. 2006).

issue in order to identify specific documents for use at trial, and the government has not yet (to defense counsel's knowledge) been called on to justify withholding specific documents. Any analysis of whether the thousands of still-classified intercepts are helpful to Mr. Sudarshan's defense, and whether such helpfulness is outweighed by the government's national security concerns, is necessarily premature until the defense has an opportunity both to review the classified material, and to respond to any attempted showing by the government that discovery of such information should be withheld and that no substitute discovery is possible under CIPA §4.[12]

Nonetheless, even without having seen the remainder of the recorded intercepts, it is overwhelmingly likely that they are material and helpful to the defense. This is a conspiracy case. The essence of conspiracy is agreement to engage in unlawful conduct, knowing and agreeing with the alleged conspiracy's unlawful goals. Recorded conversations among the alleged co-conspirators, including recorded conversations on Mr. Sudarshan's phones, are likely to constitute critically probative evidence as to whether Mr. Sudarshan knowingly and willfully agreed to violate American export laws, as the government charges, or whether he engaged in transactions he believed to be lawful under a complex regulatory regime, and thus lacked any criminal intent. The government has indicated its intent to use at trial only a small number of the

---

[12] Section 4 of CIPA allows the Court, "upon a sufficient showing," to allow the government either to "delete *specified items* of classified information" from its discovery responses, "to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." 18 U.S.C. App. §4 (emphasis added). Thus, at a minimum, the government must identify the specific classified information it wants to delete from its discovery responses, and the national security reasons therefor. To protect the Defendant's discovery rights under Rule 16 and the Due Process clause, the government should also be required to show the insufficiency of the lesser remedies (substitution of a summary, or substitution of a statement of facts), before resorting to the remedy most prejudicial to the defense (simple deletion of relevant discoverable evidence). To the defense's knowledge, the government has not attempted to show the insufficiency of any substitution remedy under CIPA §4.

more than 10,000 telephone calls it recorded over a lengthy investigation. The defense surely should be entitled to discuss with the defendant (and show to the jury) additional intercepted conversations that may put the handful selected by the government in context, or show them in a different light.

In fact, the *absence* of incriminating conversations may be highly exculpatory where, as here, the government has without the defendant's knowledge recorded literally of thousands of communications that fail to show any willful misconduct. If, for example, the defendants participated in literally thousands of relevant conversations in which they show no intent to violate the law, then such evidence is plainly both relevant and material.[13] Unless the defense is allowed meaningful access to the remainder of the intercepted telephone calls, it will be forced to try the case based only on the evidence selected by the government for its allegedly inculpatory value.

Significantly, the defense need not show—sight unseen—that the classified intercepts contain *exculpatory* evidence. (Indeed, the government has an independent, affirmative obligation to review, identify, and disclose such evidence under *Brady*.) Rather, the information need only be *material*, *Yunis*, 867 F.2d at 622, *i.e.*, "helpful to the defense." *Id.* at 622, 623, 624-25 (*quoting Roviaro*, 353 U.S. at 60-61). In *United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006), the Court of Appeals noted that *Brady* information "is plainly subsumed within the *larger* category of information that is 'at least helpful' to the defendant,'" and that "information can be

---

[13] The review of the declassified intercepts (which presumably are those most favorable to the government) revealed no conversations indicating a willful intent to violate export regulations (although, as the government has previously argued, certain intercepts did reveal discussions in which the regulated nature of certain transactions was discussed).

helpful without being 'favorable' in the *Brady* sense." *Id.* at 456-57.[14] "A court applying this rule should, of course, err on the side of protecting the interests of the defendant," *United States v. Rezaq*, 134 F.3d 1121, 1142 (D.C. Cir. 1998), and should be mindful that "[t]he determination of what may be useful to the defense can properly and effectively be made only by an advocate." *Libby*, 429 F. Supp. 2d at 26 (*quoting Dennis v. United States*, 384 U.S. 855, 875 (1966)).

Evidence is material and helpful to the defense not merely where it is exculpatory on its face, but also where it may lead to the discovery of further admissible evidence, or may aid in witness preparation, corroborating testimony, or assisting impeachment or rebuttal. *See United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998). Evidence is also material and helpful to the defense if it allows the defense to prepare trial strategy, conduct investigation to discredit damaging evidence, or avoid presenting evidence that is undercut by evidence in the government's possession. *Id.* at 67-68. Inculpatory evidence in the government's possession "is just as likely to assist in 'the preparation of the defendant's defense' as exculpatory evidence," because "it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths." *Id.* at 67. The test thus is not exculpatory face value, but instead whether the evidence would be sufficiently useful to the defense that one-sided access to it is unfair.

In the case of recorded conversations in a conspiracy case, access to the details of the conversations themselves is essential to determining guilt or innocence. Whether the parties' intent was lawful or unlawful—*i.e.*, their underlying criminality or innocence—may be reflected not only in the words spoken, but also in their context, tone, inflection, and surrounding circumstances. *See, e.g., Alderman v. United States*, 394 U.S. 165, 182 (1969) (discussed in next

---

[14] The Court of Appeals further quoted *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) for the proposition that the category of evidence "that might prove helpful to the defense" is larger than the body of evidence whose nondisclosure would violate the Constitution under *Brady*. *Id.* at 457.

section).[15]  For these reasons, the remaining recorded intercepts are essential to the defense—not

only to the lawyers, but to Mr. Sudarshan as well.

**III.    MEANINGFUL DEFENSE EVALUATION AND USE OF RECORDED
         INTERCEPTS REQUIRES PERSONAL ACCESS BY MR. SUDARSHAN**

In this case, for the defense to have meaningful use of the recorded intercepts, Mr.

Sudarshan must be able to have personal access, to assist his lawyers in sifting and evaluating

those conversations.

The first reason is pragmatic: many of the conversations are likely to be in Tamil, a

language Mr. Sudarshan understands but his lawyers do not.  If Mr. Sudarshan cannot have

access to the recordings, then *all* of the recordings will have to be translated before defense

counsel can evaluate them.  There are likely to be more than 10,000 intercepts, of which a

significant percentage (counsel do not yet know how many) are likely to be in Tamil.  These

intercepts would first have to be transcribed, and then translated, to be of any use to defense

counsel.  The costs would be exorbitant.[16]  Because the conversations are classified, the

translators themselves would have to possess or obtain national security clearances, adding

further expense and delay.[17]  The cost to pay for the transcription and translation of thousands of

hours of intercepts, and then to pay for defense counsel to sift through all of those transcripts,

unaided, to identify the conversations important to Mr. Sudarshan's defense would be

prohibitive.

---

[15] *Alderman*'s abrogation on other grounds (regarding jury selection) was recognized in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), *cert. granted and judgment vacated on other grounds*, 536 U.S. 953 (2002).

[16] In D.C., professional foreign language transcription services cost between $95 and $150 per hour.  Subsequent translation would cost between $0.26 and $0.33 *per word*.

[17] The Court Security Office estimates that the time needed to obtain a clearance for a foreign-born Tamil language translator could be many months—far longer than the time taken to obtain clearance for defense counsel, all of whom are American citizens.

In contrast, Mr. Sudarshan has the ability to sift through the recorded conversations much more efficiently than his lawyers ever could. Mr. Sudarshan was a party to many of the conversations for which he seeks access, and is generally familiar with the transactions and electrical components at issue. He can recognize the other conversation participants by voice, something his lawyers cannot do. Mr. Sudarshan will quickly know which conversations are relevant to this case, which are not, and which are exculpatory. To require defense counsel to spend untold billable hours sifting all of the intercepted calls for relevance, when Mr. Sudarshan could do so much more quickly and efficiently himself, would needlessly and unjustly multiply Mr. Sudarshan's costs of defense many times over.

By personally reviewing conversations he participated in, Mr. Sudarshan would also be in a position to catch many details that may not be apparent either to his defense counsel or to government investigators. The identity of the other parties, the timing and circumstances of the calls, the context, inflection, and tone of the words used, and any other number of details may bear on the meaning of the conversations in ways that the participants would readily understand, but that outsiders reading the transcripts would not. As the Supreme Court has explained,

> [a]n apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances.

*Alderman*, 394 U.S. at 182.

The significance of such details, and the potential for misinterpretation, is only magnified when the conversations are in a language native to the speaker, but foreign to those who

investigate, accuse, try, defend, and judge him.[18]  Because his liberty hangs in the balance,

fairness requires that an accused who is tried on the basis of some recorded statements have

personal access to the rest of them, so that he may aid his lawyers in clarifying, explaining, or

challenging those statements through the adversary process.  Nothing less will satisfy the

defendant's constitutional rights to due process, to put on a defense, to have compulsory access

to evidence, or to have meaningful assistance of counsel.

## IV.    THE FBI'S CLASSIFICATION OF THE UNDISCLOSED INTERCEPT RECORDINGS DOES NOT TRUMP MR. SUDARSHAN'S RIGHTS TO A FAIR TRIAL

### A.    <u>The FBI Has Not Provided the Basis for its Classification Decision</u>

In communications to date, neither the FBI nor counsel for the government has stated the

basis for classification of the intercepts in question.  Unlike *Yunis,* sensitive sources and methods

presumably are not at issue in this case, given the government's decision to declassify over 300

intercepts that the government apparently believes are helpful to its case.[19]  The defense has no

information that any sensitive methods were used to obtain the intercepts, and further has reason

to believe that a large majority of the intercepts involved the homes, offices, or cellular phones of

Mr. Sudarshan or his co-workers (none of which are sensitive).

---

[18] Both transcription and translation of the Tamil conversations, performed by third parties detached from the facts of the case, introduce opportunities for errors in perception or interpretation.  The opportunities for such errors are multiplied if the transcription and translation are performed by different persons.  *See, e.g., Bart D. Ehrman, Misquoting Jesus* 90-93 (2005) (Biblical scholar explaining common causes of transcription and translation errors).  Of course, this case cannot be tried in Tamil; translation of the recorded evidence is necessary.  The point, however, is that if Mr. Sudarshan is not permitted to review either the recordings or the translated transcripts, he will be denied any chance to challenge (or even know of) any inaccuracies therein.

[19] In *Yunis*, the government's security interest in the recorded intercepts at issue lay "not so much in the contents of the conversations, as in the time, place, and nature of the government's ability to intercept the conversations at all."  *Yunis*, 867 F.2d at 623.  In this case, so far as the defense knows, the intercepts at issue were made through ordinary wiretaps on Mr. Sudarshan's home, business, and cell phones.  No sensitive sources or methods are at issue here.

**B.**    **The Intercepts' Classified Status Does Not Constitute an Automatic or Categorical Bar to Mr. Sudarshan's Access to the Recordings**

Even assuming *arguendo* that a valid basis for classification exists, the fact that the FBI has classified the intercepted recordings, and declines to declassify them (as it did for those recordings the government seeks to use) should not determine Mr. Sudarshan's right of access to them. The government, acting unilaterally, may not both accuse Mr. Sudarshan and determine the universe of evidence he may use to defend himself.

In a criminal proceeding where classified information is at issue, the government's own procedures, under Department of Justice policy, show two exceptions to the requirement of a security clearance to view classified information: the judge and the defendant.[20] These exceptions make eminent sense: the judge because he is an officer of the co-equal Judicial Branch (who is bound by his own Oath to preserve and defend the United States), and the defendant because it is he whose liberty is at stake in the proceeding.

In prior cases, the government has shared classified information with defendants who lacked national security clearances, where the defendants were already aware of the information due to their own personal involvement in the creation of the classified information.[21] Although those cases did not present holdings that those defendants were *entitled* to review classified information,[22] and although some of those defendants, unlike Mr. Sudarshan, had previously

---

[20] *See* 4 *United States Attorneys' Manual* tit. 9-2575, § 2054(I) (2d ed. 2007-2000) ("The requirement of security clearances does not extend to the judge or the defendant (who would likely be ineligible, anyway)."). The United States Attorneys' Manual may be viewed online at http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/crm02054.htm.

[21] *See, e.g., Giffen*, 473 F.3d at 32; *Libby*, 429 F. Supp. 2d at 13-14; *United States v. Poindexter*, 727 F. Supp. 1470, 1473 n.4 (D.D.C. 1989); *United States v. North*, 708 F. Supp. 389, 391 (D.D.C. 1988).

[22] *E.g., Libby*, 429 F. Supp. 2d at 13.

possessed security clearances,[23] they illustrate that a defendant's lack of a security clearance does not stand as an automatic bar to the defendant's access to classified information. Rather, the defendant in a criminal proceeding stands in a different position, because it is his liberty at stake.

Thus, in *Yunis*, the D.C. Circuit did not hold that defendant Yunis was barred from reviewing intercepted phone calls simply by virtue of the fact that they were classified. 867 F.2d at 621-22. Rather, the Court of Appeals reviewed the district court's analysis of whether the material sought was "relevant and helpful to the defense," to determine whether the information was required to be disclosed notwithstanding the government's national security concerns. *See id.* at 622-26. If it had been helpful to the defense, it would have been disclosable notwithstanding the fact that it was classified. *See id.* at 622-23 (recognizing government privilege in classified information, but that "this privilege must give way when disclosure of the information 'is relevant *and* helpful to the defense of an accused.'") (*quoting Roviaro*, 353 U.S. at 60-61).[24]

---

[23] *E.g., Libby*, 429 F. Supp. 2d at 13-15; *Poindexter*, 727 F. Supp. at 1473 n.4; *North*, 708 F. Supp. at 390. Notably, defendant Giffen, a private individual who had cooperated with U.S. government agencies in advancing the United States' interests in Kazakhstan, was permitted access to certain classified information notwithstanding his apparent lack of a security clearance. *See Giffen*, 379 F. Supp. at 343.

[24] The D.C. Circuit reserved the question of whether, if the classified information *was* "helpful to the defense," the defendant's interest in disclosure had to be balanced against the government's need to keep the information secret. *See Yunis*, 867 F.2d at 625 (discussing balancing test adopted by Fourth Circuit in *United States v. Smith*, 780 F.2d 1102 (4th Cir. 1985) (en banc) and by Ninth Circuit in *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988)). In *Mejia*, decided in June 2006, the D.C. Circuit still left the question open. *Mejia*, 448 F.3d at 456 n.18. Since *Mejia* was decided, however, this Court (per Judge Walton) has rejected application of the *Smith* balancing test, finding it inconsistent with the fundamental constitutional right to present a defense. *Libby*, 453 F. Supp. 2d at 41-42. Moreover, the Fourth Circuit itself has subsequently backed away from the notion that *Smith* "set[s] forth a mechanical balancing rule." *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990). Instead, the Fourth Circuit has noted that even under *Smith*, CIPA requires the disclosure or admission of classified information if the information satisfies the *Roviaro* standard of being "relevant and helpful to the defense ... or ... essential to a fair determination of a cause"; otherwise, the balancing test would

This is not a case where the defendant stands accused of terrorism, such that access to sensitive information might result in harm to the United States. *Compare, e.g.*, *Yunis*, 867 F.2d at 618-19; *United States v. Moussaoui*, 382 F.3d 453, 470 (4th Cir. 2004). Nor is it a case where revelation of the intercepted calls would reveal sensitive sources and methods of intelligence gathering. *Compare Yunis*, 867 F.2d at 623. As far as the defense is aware, the intercepted conversations were obtained through ordinary wiretaps of the defendant's telephones.

Moreover, Mr. Sudarshan was a party to many of the intercepted calls to which he seeks access. For these calls, he would not be granted access to anything he does not already know. The principal effect of allowing him access would be to enable him to aid his lawyers in sifting and evaluating the conversations, to use them as evidence in his defense at trial. These are precisely the uses guaranteed to Mr. Sudarshan under his Fifth and Sixth Amendment rights to fair adversary proceedings (*i.e.*, his Fifth Amendment right to due process, and his Sixth Amendment rights to present a defense, have compulsory process, have effective assistance of counsel, and to aid his counsel in his defense).

### C.    The Government's National Security Concerns Do Not Trump Mr. Sudarshan's Fair Trial Rights

In any event, the government's unilateral decisions regarding classification and national security do not trump an accused's constitutional right to a fair trial. Under CIPA, the government is entitled to the final word regarding disclosure of classified information, but it may come at the cost of dismissal of the indictment (or other appropriate sanction determined by the Court).

---

be at odds with the defendant's fundamental constitutional rights to compel the production of evidence and to present a complete defense. *See United States v. Moussaoui*, 382 F.3d 453, 471-72 (4th Cir. 2004) (discovery; Sixth Amendment right to compulsory process); *Fernandez*, 913 F.2d at 154 (admission of evidence at trial; Fifth and Sixth Amendment rights to present a complete defense).

CIPA protects two distinct and adverse interests: the government's interest in the secrecy of classified information, and every defendant's constitutional rights to a fair trial. The executive branch and the Court are each the exclusive arbiter within their own respective sphere: the government's determination that national security requires nondisclosure of classified information may not be overridden by the Court, *e.g.*, §6(e)(1), and likewise the Court's protection of the right of the accused to a fair trial will not give way to the government's refusal to disclose essential information, *e.g.*, §6(e)(2). The upshot is that the government makes the final determination whether to disclose classified evidence, but the price of withholding it may be that the government is unable to prosecute the accused.

These principles were recognized fifty years ago in *Jencks v. United States*, 353 U.S. 657 (1957), where "the Court held that the government's privilege in confidential reports generated by prosecution witnesses must give way to the defendant's right to effectively cross-examine the witnesses." *Moussaoui*, 382 F.3d at 475 (*citing Jencks*, 353 U.S. at 668-69). "The Court acknowledged that 'the protection of vital national interests may militate against public disclosure of documents in the Government's possession[,]'" but concluded that

> the Government can invoke its evidentiary privileges only at the price of letting the defendant go free . . . . Since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

*Moussaoui*, 382 F.3d at 475 (*quoting Jencks*, 353 U.S. at 670-71).

The same Term, in *Roviaro*, the Court recognized the importance of the government's privilege to protect the identity of confidential informants (which is rooted in informants' concern for their safety, and the public interest in the prevention of witness tampering), but it held that that privilege was limited by "the fundamental requirements of fairness," and that where disclosing the identity was "relevant and helpful to the defense of an accused, or is

essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60-61. In the case of both privileges, the respective roles of the trial court and the government were clear: the court's role was to protect the rights of the accused,[25] and if necessary, the court was to order the disclosure of evidence necessary to ensure a fair trial. *Jencks*, 353 U.S. at 671-72; *Roviaro*, 353 U.S. at 62.[26] The choice whether to comply was the government's, with the knowledge that refusing to comply meant dismissal of the prosecution. Thus, "[t]he burden is the Government's, not to be shifted to the trial judge, to decide whether the public prejudice of allowing the crime to go unpunished is greater than that attendant upon the possible disclosure of state secrets and other confidential information in the Government's possession." *Jencks*, 353 U.S. at 672, *quoted in Moussaoui*, 382 F.3d at 475 .

Thus, in the most recent and prominent cases interpreting CIPA, the courts have come down squarely on the side of protecting the trial rights of the accused, ruling that CIPA must be administered in a way that protects the defendant's fundamental constitutional rights to compel the production of evidence and present a complete defense. *See Moussaoui*, 365 F.3d at 307-08, 310-12; *Fernandez*, 913 F.2d at 154; *Libby*, 453 F. Supp. 2d at 42-44. Where "the government is simultaneously prosecuting the defendant and attempting to restrict his ability to use information that he feels is necessary to defend himself against the prosecution, . . . courts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence." *Fernandez*, 913 F.2d at 154.

In the discovery context, although "[t]here is no general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), the government may not

---

[25] *See, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966), *cited in Libby*, 453 F. Supp. 2d at 43-44.

[26] *See also Brady*, 373 U.S. at 87-88; *Giglio v. United States*, 405 U.S. 150, 153 (1972).

restrict a defendant's access to otherwise discoverable information in a way that interferes with the Due Process right to a fair trial.[27]  Moreover, where a Defendant is otherwise clearly entitled to discovery under Rule 16, CIPA should not be applied in a way that denies to the Defendant information that is helpful to his defense under *Roviaro*, 353 U.S. at 60-61.

The underlying reasons are simple and fundamental.  "Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights."  *United States v. James Daniel Good Real Property*, 510 U.S. 43, 55 (1993) (*quoting Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)).  The importance of equal access to the evidence, especially evidence in the exclusive possession of the government, is fundamental to a fairly functioning adversary system:

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive.  The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.  The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.  To ensure that justice is done, it is imperative to the function of the courts that compulsory process be available for the production of evidence needed either by the prosecution or the defense.

*United States v. Nixon*, 418 U.S. 683, 709 (1974), *quoted in Moussaoui*, 382 F.3d at 471.[28]

For these reasons, Mr. Sudarshan should not be required to defend against the government's accusations using only the recorded intercepts that the government has chosen for

---

[27] *See, e.g., Brady*, 373 U.S. at 87-88; *Giglio*, 405 U.S. at 153; *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959).

[28] The Sixth Amendment right to compulsory process, at issue in *Nixon*, is ordinarily a trial right, enforced via Federal Rule of Criminal Procedure 17.  *See, e.g., Nixon*, 418 U.S. at 711.  Where circumstances warrant, however, it may be necessary to ensure that counsel are permitted to obtain compelled production of evidence far enough in advance of trial to enable them to make use of it.  *Nixon*, 418 U.S. at 699-700; *cf. U.S. v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976) ("Disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.").

their inculpatory value (which the FBI has subsequently declassified).  Instead, Mr. Sudarshan

should have access to all of his own statements that the government possesses as well as those of

his alleged co-conspirators (as provided under Rule 16(a)(1)(B) and (E)), so that his own counsel

may evaluate which of those statements may be useful for his defense.  *See Libby*, 429 F. Supp.

2d at 26 (noting "[t]he determination of what may be useful to the defense can properly and

effectively be made only by an advocate") (*quoting Dennis v. United States*, 384 U.S. 855, 875

(1966)).  Because the practicalities of the situation mean that Mr. Sudarshan must have personal

access in order for his counsel's access to be meaningful, the Court should order the production

of Mr. Sudarshan's remaining recorded statements and that Mr. Sudarshan be permitted access to

them.  The burden is on the government to show the necessity *and the constitutional adequacy* of

any proposed alternative.

V.    **CONCLUSION**

For the foregoing reasons, Mr. Sudarshan respectfully requests that the Court:

1.    order that counsel for the Defendant be allowed to discuss with the Defendant the substance of any classified information produced by the government in this case (subject only to the requirement that such discussions take place in a secure location to be provided by the government);

2.    order that the government provide the defendant with access to all classified information provided to defendant's counsel; or,

3.    as an alternative to the preceding requests, conduct a pretrial conference, under CIPA §2, to address classified information issues; and

4.    after such pretrial conference, order that Mr. Sudarshan be permitted to listen to and take notes of all recorded statements provided by the government to his counsel and to discuss the contents of such statements with his counsel (under the terms of an appropriate protective order under CIPA §3), in order to aid his counsel in the preparation of his defense.

Respectfully submitted,

/s/  William T. Hassler
Reid H. Weingarten (D.C. Bar #365893)
William T. Hassler (D.C. Bar #366916)
Robert A. Ayers (D.C. Bar # 488284)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

*Counsel for Defendant Parthasarathy Sudarshan*

October 31, 2007

# Sudarshan Ex. 1



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

_____

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

October 12, 2007

<u>VIA FACSIMILE</u>

William T. Hassler, Esq.
Steptoe & Johnson
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795

     Re:   <u>United States v. Parthasarathy Sudarshan</u>, Cr. No. 07-051 (RMU)

Dear Mr. Hassler:

     I have been informed by the FBI's National Security Law Branch ("NSLB") that it will not declassify the phone intercepts that are currently classified and that it will not permit anyone who does not have a security clearance to have access to them.

     As I have previously told you, Rochester Electronics, Inc. ("REI"), cooperated with the FBI in connection with the second shipment of i960 microprocessors that occurred on October 13, 2005. With respect to your inquiry last week about the FBI's relationship with Rochester Electronics, Inc. ("REI"), I can make the following representations: First, the FBI did not write any of the e-mails between REI and Cirrus Electronics ("Cirrus") or instruct any person at REI as to what to say in any of the e-mails or review the e-mails before they were sent. Nor did the FBI script any of the meetings that occurred between REI representatives and Mr. Sudarshan. No FBI agent was present at those meetings in an undercover capacity, and the FBI did not monitor the meetings. To the extent that there were any phone conversations between anyone at REI and Mr. Sudarshan, the FBI was not present with any REI person when such calls may have occurred. The FBI did request REI to seek certain information from Mr. Sudarshan. This information included more details about the ultimate destination of the microprocessors, more information about the end-use of the products, and an explanation for why Cirrus was routing the goods to India through Singapore. The FBI also requested REI to advise Mr. Sudarshan of the need for him to determine the licensing requirements for the items. The FBI did not pay REI for its assistance nor did it make any promises to REI. There was no formal written agreement between REI and the FBI in connection with the October 2005 shipment.

Please let me know if you have any questions.

Very truly yours,

Jay I. Bratt
Assistant United States Attorney
(202) 353-3602

–2–

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

**UNITED STATES OF AMERICA**

    **v.**

**PARTHASARATHY SUDARSHAN,**
**_et al._,**

    **Defendants.**

_____

)
)
)
)
)
)
)
)
)
)
)

  **Criminal No. 07-0051 (RMU)**

**ORDER**

   Having considered Defendant Parthasarathy Sudarshan's Motion for Personal Access to Classified Intercepts, or in the Alternative For Pretrial Conference Under Classified Information Procedures Act Section 2, along with the Government's opposition thereto and the relevant authorities submitted to the Court, IT IS HEREBY ORDERED that:

   1.  Defendant Sudarshan's motion is GRANTED; and

   [2.  Upon the entry of an appropriate revised Protective Order, Defendant Sudarshan's counsel who possess the appropriate security clearances shall be authorized to share and discuss with Defendant Sudarshan the contents of any classified information produced in discovery in this case (including but not limited to all intercepted recordings the Government has disclosed to Sudarshan's counsel), in a secure location to be provided by the government, under terms and conditions that protect such evidence from further disclosure without authorization of this Court; and

   3.  Counsel for the Parties are ordered to confer and to submit to this Court an appropriate revised Protective Order containing procedures for such review;]

           [OR, in the alternative:]

[2.     The Parties shall appear before this Court on _____

[November 26, 2007 or such other date as the Court orders] for a Pretrial Conference to consider

matters relating to classified information, pursuant to Section 2 of the Classified Information

Procedures Act, Pub. L. 96-456, 18 U.S.C. App. Sec. 2.]

          SO ORDERED.


                                                      _____
                                                      The Hon. Ricardo M. Urbina
                                                      United States District Judge


Dated: _____
Washington, D.C.