## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 07-0051 (RMU)** |
| | ) | |
| **PARTHASARATHY SUDARSHAN,** | ) | |
| *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

### DEFENDANT PARTHASARATHY SUDARSHAN'S MOTION TO DISMISS
### COUNTS TEN THROUGH FOURTEEN

Pursuant to Federal Rule of Criminal Procedure 12(b)(2), Defendant Parthasarathy Sudarshan, through counsel, respectfully moves to dismiss Counts Ten through Fourteen of the Superseding Indictment because those counts fail to state offenses against the laws of the United States. In addition, because the government's expert witness summary indicates that the relevant evidence dispositive of Counts Thirteen and Fourteen is undisputed, and establishes that the conduct charged in those counts is not unlawful, Counts Thirteen and Fourteen, and so much of Count Ten as concerns the substantive conduct charged in Counts Thirteen and Fourteen, should be dismissed with prejudice for insufficiency of the evidence. *See United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005).

Oral argument is requested on the motion. A memorandum of points and authorities and a proposed order are attached.

- 1 -

Respectfully submitted,

/s/  William T. Hassler
Reid H. Weingarten (D.C. Bar #365893)
William T. Hassler (D.C. Bar #366916)
Robert A. Ayers (D.C. Bar # 488284)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

*Counsel for Defendant Parthasarathy Sudarshan*

November 15, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal No. 07-0051 (RMU)** |
| ) | |
| **PARTHASARATHY SUDARSHAN,** ) | |
| ***et al.*,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT PARTHASARATHY SUDARSHAN'S MOTION TO DISMISS COUNTS TEN THROUGH FOURTEEN

Pursuant to Federal Rule of Criminal Procedure 12(b)(2), Defendant Parthasarathy Sudarshan, through counsel, respectfully moves to dismiss Counts Ten through Fourteen of the Superseding Indictment[1] because those counts fail to state offenses against the laws of the United States. In addition, because the government's expert witness summary indicates that a substantial portion of the capacitors charged in Counts Ten, Thirteen and Fourteen were in normal commercial use, as a matter of law those capacitors are not on the United States Munitions List and their unlicensed exportation is not illegal. The counts relating to the capacitors should therefore be dismissed for insufficiency of the evidence.

## SUMMARY

Counts Ten through Fourteen of the Superseding Indictment charge Mr. Sudarshan with unlawfully exporting certain "i960 MC" microprocessor chips (Counts Eleven and Twelve); unlawfully exporting certain capacitors (Counts Thirteen and Fourteen); and conspiring to commit those offenses (Count Ten). Each disputed count depends on the allegation that the item

---

[1] Indictment, October 31, 2007 (Dkt. 60) ("Superseding Indictment" or "SI").

in question was listed on the United States Munitions List, 22 C.F.R. § 121.1, such that its exportation was illegal unless the exporter possessed a license issued by the Department of State. *See* SI at 20-21, ¶¶ 5-7; 22 U.S.C. § 2778(b)(2).

The facts alleged in the Superseding Indictment, however, do not support any allegation that the items charged were listed on the Munitions List. The Superseding Indictment's bare and conclusory charge that each item "was a defense article on the Munitions List," SI at 21, ¶¶ 6 & 7, is a conclusion of law, not an allegation of fact, which may be challenged by a motion to determine the charge's legal sufficiency. The conclusory allegation that the i960 MC chips and the capacitors charged here were on the Munitions List is wrong as a matter of law: on the facts alleged in the Superseding Indictment, the items either may or may not be on the Munitions List, depending on whether they are in "normal commercial use." 22 C.F.R. § 121.1, Cat. XI(c). On the question of "normal commercial use"—which determines whether the items were on the Munitions List, and thus whether their exportation was legal or illegal—the Superseding Indictment is silent.

If these items are in normal commercial use, then they are not listed under Category XI(c) of the Munitions List, and their exportation is not illegal. For the capacitors charged in Counts Thirteen and Fourteen, the government has recently given notice that its expert witness will testify that 17% of those types of capacitors are in normal commercial use.[2] As a matter of law, those capacitors fall within the "normal commercial use" carve-out to Category XI(c), and thus those capacitors are not listed on the Munitions List. Their exportation therefore is not illegal as charged in Counts Thirteen and Fourteen.

---

[2] The question is not whether the particular capacitors exported here were put to normal commercial use, but rather whether capacitors of that type are generally in normal commercial use. 22 C.F.R. § 120.3 (discussed at pages 9-10, *infra*).

With respect to the i960 MC microprocessors, the government has attempted to plead around this problem by characterizing the i960 MC chips as "computers" under Munitions List Category XI(a)(6) rather than "components" under Category XI(c), since the "computer" designation under Category XI(a)(6) does not contain a "normal commercial use" carve-out. This allegation, however, is also wrong as a matter of law. Because the microprocessors have no use standing on their own, without installation in some other end-item (whether a computer or other electronic control system), under the Munitions List's interpreting regulations they are electronic "components" (22 C.F.R. § 121.8(b)), which are listed, if at all, only under Category XI(c). Because the i960 MC microprocessor also has normal commercial uses (as the evidence will show at trial), it too is not included among the "components" classified as defense articles under Munitions List Category XI(c).

Although the Federal Rules of Criminal Procedure contain no express counterpart to the motion for summary judgment under the rules of civil procedure, the Court may dismiss an indictment for insufficiency of the evidence where the relevant facts are undisputed, the government does not object, and the undisputed facts show the charged conduct is not unlawful. *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005). As to the capacitors, because the government does not dispute that 17% of such capacitors are in civil applications, the capacitors are in "normal commercial use" within the meaning of Category XI(c), and thus are not designated as defense articles on the Munitions List. Dismissal for insufficiency of the evidence is thus appropriate for the counts alleging exportation of the capacitors (Counts Thirteen and Fourteen), and for the charge of conspiring to export them (thus eliminating their exportation as an object of the conspiracy charged in Count Ten). In the alternative, even if the government claims a dispute as to whether the capacitors are "in normal commercial use," the Superseding

Indictment's failure to allege whether or not they are in "normal commercial use" makes the indictment insufficient as a matter of law, because it fails to allege sufficient facts to show that the conduct charged is illegal.

For the i960 MC microprocessors, the defense expects the evidence to show they too were in normal commercial use, which means they also are not designated under Category XI(c) of the Munitions List. The government will likely dispute this issue, making it unripe for a pretrial challenge to the sufficiency of the evidence. Even if there is a dispute about normal commercial use of the i960 MC, however, the silence of Counts Ten through Twelve regarding commercial use—the fact which separates legality from illegality—renders those counts insufficient as a matter of law, because they fail to allege facts constituting an offense.

## PROCEDURAL HISTORY

Mr. Sudarshan pled not guilty to the original indictment on April 3, 2007. On October 31, 2007, the grand jury returned the Superseding Indictment (Dkt. 60), amending the relevant counts. Mr. Sudarshan has not yet been arraigned on the Superseding Indictment.

On November 2, 2007, on the parties' consent motion, this Court extended the time to submit pretrial motions to November 15, 2007.

Under Rule 12(b)(3)(B), a claim that the indictment fails to state an offense may be raised at any time. *See, e.g.*, *Williams v. District of Columbia*, 419 F.2d 638, 648 (D.C. Cir. 1969). Though Mr. Sudarshan submits this motion to dismiss pursuant to Rule 12(b)(2) at the time set for pretrial motions under Rule 12(c), he respectfully reserves the right to supplement or renew the motion at later stages as appropriate.

## CHALLENGED ALLEGATIONS IN THE INDICTMENT

This motion seeks to dismiss Counts Ten through Fourteen of the Superseding Indictment. Count Ten alleges a conspiracy to export certain "i960 MC" microprocessor chips

and certain capacitors that are allegedly designated "defense articles" on the United States

Munitions List, 22 C.F.R. § 121.1, in violation of the Arms Export Control Act ("AECA"), 22

U.S.C. § 2778(b)(2), and the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R.

Parts 120-130.  *See* SI at 20-24.  Counts Eleven and Twelve allege two substantive exportation

offenses involving the i960 MC microprocessors.  SI at 29.  Counts Thirteen and Fourteen allege

two substantive exportation offenses involving the capacitors.  SI at 30.

The original indictment alleged that the microprocessors' and capacitors' designation on

the Munitions List depended on the actual application of the particular parts exported in this

case.[3]  Those allegations were deficient as a matter of law, because under the ITAR regulations,

the end use of the particular items exported does not determine whether those items are on the

Munitions List.  22 C.F.R. § 120.3  ("The intended use of the article or service after its export

(*i.e.*, for a military or civilian purpose) is not relevant in determining whether the article or

service is subject to the controls of this subchapter.").

After being advised by the Department of State of this legal deficiency, the government

obtained a Superseding Indictment that omits the link between the actual use of the items

charged and their listing on the Munitions List.  Instead, the Superseding Indictment's allegation

that the i960 MC is a defense article on the Munitions List is as follows:

> 6.  The i960MC Intel Microprocessor (Standard Military Design Number
> 5962-9094603MYA) ("i960MC microprocessor") was manufactured by a ven-
> dor in Newburyport, Massachusetts, under license from Intel.  The i960MC
> microprocessor was specifically designed for military applications and was
> used in the navigation and weapons guidance systems of the Tejas Light Com-

---

[3] For the i960 microprocessor, the original indictment alleged, "The i960 microprocessor
had applications in the navigation and weapons guidance systems of the Tejas Light Combat
Aircraft.  *For such applications*, the i960 was a defense article on the Munitions List ...."  In-
dictment (Dkt. 1) at 20 ¶ 7 (emphasis added).  For the capacitors, the original indictment alleged:
"These [capacitors] were defense articles on the Munitions List *for exports to VSSC*" (part of the
Indian space agency).  *Id.*¶ 8 (emphasis added).

bat Aircraft. The i960MC microprocessor was a defense article on the Munitions List and could not be exported from the United States to India without the exporter first obtaining a license from the DDTC.[4]

SI at 21 ¶ 6.

The Superseding Indictment's allegation that the capacitors were defense articles on the

Munitions List is as follows:

> 7. The M39014/01-1284, the M39014/01-1299, the M39014/01-1317, the M39014/01-1535, and the M39014/01-1553 were capacitors and were specifically designed for military applications. These items were defense articles on the Munitions List and could not be exported from the United States to India without the exporter first obtaining a license from the DDTC.

SI at 21 ¶ 7.

## ARGUMENT

### I.     Standards for Obtaining Relief

#### A.     Where the Facts Are Undisputed, and They Fail to Show an Offense, This Court May Dismiss Before Trial for Insufficiency of the Evidence

Although the Federal Rules of Criminal Procedure contain no express counterpart to a

motion for summary judgment under the rules of civil procedure, the Court may dismiss an

indictment before trial for insufficiency of the evidence to convict, if the relevant facts are

undisputed, the government does not object, and the undisputed facts fail to constitute an offense

as a matter of law. *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005).

As argued in Section III.A below, the relevant facts are undisputed for the capacitors

charged in substantive offense Counts Thirteen and Fourteen and as a conspiracy object in Count

Ten.

---

[4] "DDTC" stands for the Director of Defense Trade Controls, which is the relevant licensing authority within the United States Department of State. SI at 20 ¶ 5.

### B.    Where the Indictment Alleges Conduct That May Be Legal, It Fails to State an Offense

To be legally sufficient, an indictment must allege "the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c), with sufficient particularity to allow the Court to determine whether those facts constitute an offense as a matter of law.  *E.g.*, *Russell v. United States*, 369 U.S. 749, 768 (1962).  "[I]t is not sufficient that the indictment shall charge the offence in the same generic terms as in the [statutory] definition; but it must state the species,—it must descend to particulars."  *Id.* at 765 (citation and internal quotation marks omitted).  Thus, "[a]n indictment should contain every essential fact necessary to clearly define the crime, and the offense sought to be charged should be set out with sufficient accuracy and completeness to support a judgment, either upon demurrer or conviction."  *United States v. Geare*, 293 F. 997, 1000 (D.C. Cir. 1923).[5]  If an indictment alleges conduct which may be legal, it fails as a matter of law to state an offense.  *Moens v. United States*, 267 F. 317, 322 (D.C. Cir. 1920) ("If the indictment may be true, and still the accused may not be guilty of that offense, the indictment is insufficient.") (citation omitted).[6]

This Court has granted, and the Court of Appeals has upheld, the pretrial dismissal of indictments that failed as a matter of law to state an offense.  *See, e.g., United States v. Espy*, 989 F. Supp. 17, 41-42 (D.D.C. 1997), *aff'd in relevant part and rev'd in part*, 145 F.3d 1369, 1370 (D.C. Cir. 1998); *United States v. Oakar*, 111 F.3d 146, 147-50 (D.C. Cir. 1997) (cited in *Yakou*, 428 F.3d at 247).

---

[5] *Accord United States v. Superior Growers Supply*, 982 F.2d 173, 177 (6th Cir. 1992) ("To be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime."); *United States v. Polychron*, 841 F.2d 833, 834 (8th Cir. 1988) (to same effect).

[6] *Accord Polychron*, 841 F.2d at 834 (if acts alleged do not violate the law, indictment must be dismissed); *United States v. Cure*, 804 F.2d 625, 627 (11th Cir. 1986) (court "required to dismiss the indictment if it fails to allege facts that constitute a prosecutable offense").

## II.    Electronic Components That Are in "Normal Commercial Use" Are Not Included on the United States Munitions List, and Thus Are Not Subject to the Arms Export Control Act

The Arms Export Control Act prohibits the exportation, without a license from the State Department, of any items designated by the President as "defense articles" for export control purposes.  22 U.S.C. § 2778(b)(2).[7]  The list of "defense articles" so designated is called the "United States Munitions List."  § 2778(a)(1); *Yakou*, 428 F.3d at 243.  The United States Munitions List is codified at 22 C.F.R. § 121.1 ("Munitions List").  Pursuant to the AECA, the State Department has also promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, to govern enforcement of the AECA.

The Munitions List, 22 C.F.R. § 121.1, does not list controlled defense articles by name, manufacturer, part number, or the like.  Instead, it lists categories of defense-related goods and services, and gives definitions of items that would fall within the various designations.  Some definitions, such as those for weapons and military vehicles, are fairly straightforward.  *E.g.*, 22 C.F.R. § 121.1, Category I(a)-(b) (firearms to .50 caliber); Category II(a) (guns over .50 caliber); Category VII(b) (military tanks, combat engineer vehicles, bridge launching vehicles, half-tracks and gun carriers).  Others depend on whether the items are specifically designed for military application.  For instance, Category X(a) designates "Protective personnel equipment specifically designed, developed, configured, adapted, modified, or equipped for military applications."  Under this designation, some clothing, such as body armor or clothing designed "to protect against or reduce detection by radar, infrared (IR) or other sensors," falls within the Munitions List designation, Category X(a)(2), while similar items without such specialized application, such as clothing for hunting or mountaineering, for example, would not be covered.

---

[7] The President has delegated this designation function to the Secretary of State.  *See* Exec. Order No. 11,958, 42 Fed. Reg. 4311 (Jan. 18, 1977); 22 C.F.R. § 120.1(a).

The section of the Munitions List charged in the Superseding Indictment is Category XI, Military Electronics. Category XI(a) covers "[e]lectronic equipment not included in Category XII of the U.S. Munitions List which is specifically designed, modified or configured for military application."[8] Category XI(a) gives a nonexhaustive list of examples, including sonar equipment (XI(a)(1)-(2)), radar systems (XI(a)(3)), electronic combat equipment (XI(a)(4)), *et cetera*. Category XI(a)(6) covers "[c]omputers specifically designed or developed for military application and any computer specifically modified for use with any defense article in any category of the U.S. Munitions List." Category XI(c) includes electronic components, parts and accessories for equipment covered under XI(a), but it contains an important carve-out—it does not include items that have normal commercial uses:

> (c)  Components, parts, accessories, attachments, and associated equipment specifically designed or modified for use with the equipment in paragraphs (a) and (b) of this category, **except for such items as are in normal commercial use.**

22 C.F.R. § 121.1, Cat. XI(c) (emphasis added).

Importantly, the intended end-use for the specific item being exported does not determine whether that item is on the Munitions List:

> The intended use of the article or service after its export (*i.e.*, for a military or civilian purpose) is not relevant in determining whether the article or service is subject to the controls of this subchapter.

---

[8] Category XII governs fire control, range finding, optical and guidance and control systems. Although the Superseding Indictment alleges that the i960 MC microprocessor "was used in the navigation and weapons guidance systems of the Tejas Light Combat Aircraft," SI at 21 ¶ 6, it does not charge that either the i960 MC or the specified capacitors were listed under Category XII of the Munitions List. Category XII, like Category XI, does not designate components, parts, accessories, attachments, or associated equipment that are "in normal commercial use" as defense articles on the Munitions List." 22 C.F.R. § 121.1 Cat. XII(e).

22 C.F.R. § 120.3.[9]  Indeed, the Directorate of Defense Trade Controls (the division of the State

Department that licenses exportation of Munitions List items) explains in a "FAQs" (Frequently

Asked Questions) list on its website that the fact that an item is being sold for use by a foreign

military is not relevant in determining whether the item is on the Munitions List:

> Q:  I am selling my civil item to a foreign military.  Does this make it USML
> and do I need an export license from State?
>
> A:  You do not need an export license from DDTC if your item is not con-
> trolled on the USML.  **That remains true even if you are selling the item to
> a foreign military.  The end-user does not determine export jurisdiction.**[10]

Thus, to determine whether an electronic item in a specific case falls within Category XI

of the Munitions List, one does not look to the use to which that item was intended to be put after

its exportation.  Instead, one looks to the original design intent, to determine whether it was

"specifically designed,  modified or configured for military application."  22 C.F.R. § 121.1, Cat.

XI(a).  In addition, if the item is a component, part, or accessory of a controlled item, rather than

a stand-alone controlled item itself (*i.e.*, an "end-item," § 121.8(a)),[11] one must then determine

---

[9] "[T]his subchapter," in § 120.3, refers to the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Subch. M, Parts 120-130, including the United States Munitions List, § 121.1.

[10] Directorate of Defense Trade Controls, U.S. Dep't of State, "Commodity Jurisdiction (CJ) FAQs," *available at* http://www.pmddtc.state.gov/docs/faqs_cj.pdf (Ex. A hereto) (emphasis altered).

[11] The ITAR regulations following the Munitions List contain a series of additional interpretations that explain and amplify the terms used in the Munitions List.  22 C.F.R. § 121.2. Section 121.8 explains the difference between "end-items" and "components," "parts," "accessories," and "attachments," the items listed under Category XI(c):

> **§ 121.8  End-items, components, accessories, attachments, parts, firmware, software, and systems.**
>
> (a)  An *end-item* is an assembled article ready for its intended use.  Only ammunition, fuel or another energy source is required to place it in an operating state.
>
> (b)  A *component* is an item which is useful only when used in conjunction with an end-item.  A major component includes any assembled element which forms a portion of an end-item without which the end-item is inoperable.

whether it falls into Category XI(c)'s carve-out for items "in normal commercial use." Even if an electronic component is "specifically designed or modified for use with the equipment in" Cat. XI(a) (*i.e.*, electronic equipment with specific military design), it is nonetheless *not* a controlled defense article if it is "in normal commercial use." § 121.1, Cat. XI(c). Again, the question is not whether the specific item exported was intended, after export, to be put into a normal commercial use. § 120.3 (quoted at page 9, *supra*). Rather, it is whether the item generally, as designed, is "in normal commercial use"—that is, whether the item *has* a "normal commercial use."[12]

---

(EXAMPLE[S]: Airframes, tail sections, transmissions, tank treads, hulls, etc.). A minor component includes any assembled element of a major component.

(c) *Accessories* and *attachments* are associated equipment for any component, end-item or system, and which are not necessary for their operation, but which enhance their usefulness or effectiveness. (EXAMPLES: Military riflescopes, special paints, etc.)

(d) A *part* is any single unassembled element of a major or a minor component, accessory, or attachment which is not normally subject to disassembly without the destruction or the impairment of design use. (EXAMPLES: Rivets, wire, bolts, etc.)

[12] The "normal commercial use" exception is critical to the division of export control responsibility between the Department of State and the Department of Commerce. Under the AECA and the ITAR, the Department of State controls export of all items designated as "defense articles," that is, items specifically designed, modified or configured for military applications. *See* 22 U.S.C. § 2778. Many items that have normal commercial or civil applications, however, also have military applications. Such "dual-use" items are controlled by the Bureau of Industry and Security ("BIS") within the Department of Commerce, under the Export Administration Regulations, 15 C.F.R. §§ 730-734 ("EAR"). *See* Bureau of Industry and Security, U.S. Dep't of Commerce, "Introduction to Commerce Department Export Controls: Overview," *available at* http://www.bis.doc.gov/licensing/exportingbasics.htm ("We often refer to the items that BIS regulates as 'dual-use'—items that have both commercial and military or proliferation applications ...."); Cecil Hunt, "Overview of U.S. Export Controls," at 8, *in Coping with U.S. Export Controls 2006*, 17, 18 (Evan R. Berlack & Christopher R. Wall eds., 2006).

III.    **The Capacitors Charged in Counts Thirteen and Fourteen Are Undisputedly in Normal Commercial Use, and Therefore Are Not Components Included on the Munitions List Under Category XI(c)**

A.    **The Government's Expert Witness Disclosure Shows Undisputed Facts Sufficient to Establish the Capacitors Are in Normal Commercial Use**

On October 31, 2007, the same day the grand jury returned the Superseding Indictment, the government disclosed to the defense a summary of its expected expert witness testimony, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G).[13]  The government indicated that its expert witness would testify, based on his research into the applications of the capacitors charged in Counts Thirteen and Fourteen, that those capacitors "are components, parts, accessories, attachments, and associated equipment ... within the meaning of Category XI(c)," and that his research had revealed that 17% of such capacitors sold by their manufacturers are in civil applications.  Ex. B at 5 & n.4.  The government's own statement of the anticipated evidence makes clear it is undisputed that 17% of the capacitors of the type charged in Counts Thirteen and Fourteen are put into normal civil or commercial applications, and thus that such capacitors are "in normal commercial use" within the meaning of Category XI(c).

Again, the AECA prohibits exportation of the capacitors only if the capacitors have been designated as "defense articles" by the President, 22 U.S.C. § 2778(b)(2), that is, if the capacitors are on the Munitions List.  *See* 22 U.S.C. § 2778(a)(1); 22 C.F.R. § 121.1.  The government has charged that the capacitors are electronic "components, parts, accessories," etc., listed under Munitions List Category XI(c), *see* SI at 30, Counts Thirteen and Fourteen, and has indicated its expert witness will testify that the capacitors were designed for military applications, Ex. B at 5, and thus fall within Category XI(c).  But the government makes no mention, either in the Superseding Indictment or its expert witness summary, of Category XI(c)'s carve-out for components,

---

[13] The government's expert witness summary, redacted to exclude discovery matters not relevant here, is attached as Ex. B.

even those designed for military use, that are also "in normal commercial use." 22 C.F.R. § 121.1, Cat. XI(c). Because the government's own expert witness disclosure shows it is undisputed that these capacitors are in normal commercial use (with 17% of them sold being used in civil applications), as a matter of law they do not fall within Category XI(c). They therefore are not listed on the Munitions List, and their exportation without a State Department license is not unlawful.

**B.    Because, on the Undisputed Facts, the Capacitors Are Not on the Munitions List, the Court Should Dismiss Those Counts for Insufficiency of the Evidence**

Because the critical fact that determines whether or not the capacitors are on the Munitions List (*i.e.*, normal commercial use) is not disputed, this Court may decide the issue before trial as a matter of law. *Yakou*, 428 F.3d at 246-47. And because, as shown above, the capacitors are not on the Munitions List as a matter of law, their exportation without a State Department license is not illegal. This Court should dismiss Counts Thirteen and Fourteen, alleging their unlawful exportation, for insufficiency of the evidence. *See Yakou*, 428 F.3d at 247-48. Moreover, because their exportation is not illegal, such exportation also may not constitute the object of a conspiracy to violate the laws of the United States. The Court therefore should strike the allegations regarding exportation of the capacitors from the conspiracy count (Count Ten).

**C.    In the Alternative, the Court Should Dismiss the Capacitor Counts For Failure to State an Offense**

In the alternative, the Court should dismiss the counts alleging unlawful exportation of the capacitors for failure to state an offense. "If the [allegations in the] indictment may be true, and still the accused may not be guilty of that offense, the indictment is insufficient." *Moens*, 267 F. at 322 (citation omitted).[14]

---

[14] *Accord Russell*, 369 U.S. at 768 & n.l5 (purpose of requiring factual specificity in the

Here, Counts Thirteen and Fourteen, charging exportation of the capacitors, are insufficient because they fail to allege facts showing the capacitors are not "in normal commercial use," and therefore are designated under Category XI(c) of the Munitions List. Indeed, the indictment is entirely silent on "normal commercial use," even though that fact is determinative of whether the items are listed or not, and thus whether their exportation is legal or illegal. The indictment does allege the capacitors "were specifically designed for military applications," SI at 21 ¶ 7, and appears to assume, as does the government's expert witness, that such design alone is sufficient to make the capacitors a designated item under Category XI(c). *See* SI at 30, Counts Thirteen and Fourteen (specifying Munitions List Cat. XI(c) as the provision making the exportation unlawful). This assumption is wrong as a matter of law, because if such capacitors are in "normal commercial use," then they are not within Category XI(c), and their exportation is not illegal.

The bare allegation that "[t]hese items were defense articles on the Munitions List," SI at 21 ¶ 7, does not make the capacitor counts sufficient to state an offense. First, it is a bare statement of the pleader's legal conclusion. A bare legal conclusion, unaccompanied by factual allegations, does not make an indictment sufficient to state an offense. *See, e.g.*, *Russell*, 369 U.S. at 765 (citing authorities); *Geare*, 293 F. at 1000 ("mere[] conclusions of the pleader," unaccompanied by the "essential fact[s] necessary to clearly define the crime," were insufficient to sustain indictment). Moreover, when coupled with the only relevant factual allegation in the indictment—that the capacitors "were specifically designed for military applications"—the

---

indictment "is to enable the court to decide whether the facts alleged are sufficient in law to withstand a motion to dismiss the indictment or to support a conviction in the event that one should be had") (citation omitted); *Superior Growers Supply*, 982 F.2d at 177 ("To be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime."); *Geare*, 293 F. at 1000.

- 14 -

conclusory allegation that the capacitors were "defense articles on the Munitions List" is wrong as a matter of law. *Even if* they were specifically designed for military applications, the capacitors were *not* on the Munitions List under Category XI(c) (the category alleged, SI at 30) if they were "in normal commercial use." This Court may adjudicate this deficiency as a matter of law, without general trial of the issue, Rule 12(b)(2), and so should dismiss the indictment as insufficient to state an offense under 22 U.S.C. § 2778(b)(2).

Under the facts alleged in the indictment—that the Defendants exported the specified capacitors, without a license, and that the capacitors were specifically designed for military applications—it would be possible to prove all those facts true, and still have them not constitute an offense, if the capacitors are in normal commercial use and thus not within Category XI(c). Because the indictment's silence as to that factor leaves the possibility that the Defendant could be convicted for lawful conduct, those counts of the indictment must be dismissed.

## IV. The i960 MC Microprocessors Charged in Counts Ten through Twelve Also Are Not Included on the Munitions List

The indictment's allegations with respect to the i960 MC microprocessors (Counts Ten through Twelve) suffer from the same legal defect: they do not address the "normal commercial use" exception for electronic components under Category XI(c), and therefore do not state an offense.

Irrespective of whether the i960 MC microprocessor was designed for military application as the government contends, the evidence will show that the i960 MC was also used in a variety of civil and commercial applications. Thus, it was "in normal commercial use" within the meaning of Category XI(c)'s exception, and was therefore not illegal to export. Although the evidence regarding the i960 MC's design and commercial use is not undisputed (as with the capacitors), and thus a challenge to the sufficiency of the evidence will have to await a motion

for acquittal under Rule 29, the i960 MC counts should still be dismissed for failure to state an

offense, because those counts' silence regarding the i960 MC's normal commercial use leaves

open the possibility that the indictment's facts could be proven and yet fail to constitute an of-

fense against the law.

    In the Superseding Indictment, the government has tried to plead around this problem by

alleging the i960 MC chips are "computers" subject to § 121.1 Category XI(a)(6), rather than

"components" under Category XI(c). *See* SI at 29, Counts Eleven and Twelve; *see also* Ex. B at

4. This allegation, however, is incorrect as a matter of law. Under the regulatory interpretations

of the terms in the Munitions List, the i960 MC chips, which perform no useful function standing

alone unless installed in a larger piece of equipment, are "components," not regulated "end-

items." As "components," the chips are regulated, if at all, only under Category XI(c), which

carves out items "in normal commercial use."

### A.    Under the ITAR Regulations, Microprocessors Such as the i960 MC Are "Components," Not "Computers"

    Under the AECA, the State Department was authorized to promulgate the International

Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130. *See* 22 C.F.R. § 120.1(a).

Those regulations, which contain the Munitions List itself (§ 121.1), also contain, immediately

following the Munitions List, a series of interpretations of the Munitions List, which "explain

and amplify the terms used in § 121.1." 22 C.F.R. § 121.2. One of those interpretations,

§ 121.8, explains the difference between *end-items*, which are themselves controlled on the

Munitions List, and "components, parts, accessories, and attachments" of such controlled end-

items.[15]

---

[15] § 121.8 is quoted in relevant part in note 11, *supra*.

"End-item" is the term the ITAR uses to denote a stand-alone defense article that is itself controlled by the Munitions List: "An *end-item* is an assembled article ready for its intended use. Only ammunition, fuel or another energy source is required to place it in an operating state." § 121.8(a). A tank, a machine gun, or a military airplane would be examples of end-items designated on the Munitions List. *See* § 121.1, Category VII(b) (military tanks); *id.*, Category I(b) (fully automatic firearms to .50 caliber); *id.*, Category VIII(a) (military aircraft).

A "component," on the other hand, "is an item which is useful only when used in conjunction with an end-item." § 121.8(b). As examples of "major components," *i.e.*, portions of end-items without which the end-item is inoperable, the regulation lists "[a]irframes, tail sections, transmissions, tank treads, hulls, etc." *Id.* The regulation further defines "minor component" as "any assembled element of a major component."[16]

The i960 MC charged in Counts Ten through Twelve is a 32-bit microprocessor chip originally designed and manufactured by Intel. SI at 21 ¶ 6.[17] When installed, whether in a computer or an embedded application, it performs complex computing functions. Indeed, as the "brain" of a computer or electronic control system, it is an essential component without which the computer or electronic control system will not function. Thus, it qualifies as a "major component" under § 121.8(b). But a microprocessor standing alone, uninstalled in a computer or other electronic control system, performs no useful work by itself.[18] It requires more than simply

---

[16] Section 121.8's definitions of "attachments," "accessories," and "parts," § 121.8(c) and (d), are not relevant here.

[17] For a description of the i960 MC, see the introduction to the Intel datasheet attached as Ex. C (quoted in Section IV.B, *infra*).

[18] Though it has complex computing ability when installed, the chip standing alone is simply a coin-sized piece of integrated circuitry. (A picture of related chips in the Intel i960 family (though not the i960 MC) is attached as Ex. D.) Indeed, in the importation context, U.S. Customs and Border Protection has classified microprocessors, standing alone, as "parts" of automatic data processing machines ("ADPs"), rather than as ADPs themselves. *See* Customs

the provision of an energy source, § 121.8(a), to do the work it is designed to do.  Without at-

tachment to any memory device, any interface allowing input or output of data, or any control

mechanism, the chip can perform no computing function.  Standing alone, the microprocessor is

no more useful for computing (or any other use) than a transmission is useful without an engine,

or a tank tread without a tank.  *Cf.* § 121.1(8)(b) (defining transmissions and tank treads as "ma-

jor components" rather than "end-items").

Thus, under the regulatory interpretation contained in § 121.8(a) and (b), a microproces-

sor is a "component" as that term is used in the Munitions List (including in Category XI(c)), and

not an "end-item" such as a "computer" under Category XI(a)(6).  The Superseding Indictment's

allegation that the i960 MC microprocessor is a "computer" under Category XI(a)(6) is thus

incorrect as a matter of law.  If the i960 MC microprocessor is listed on the Munitions List at all,

it is only as an electronic "component" under Category XI(c), and not a "computer" under

XI(a)(6).

**B.    The i960 MC Microprocessors Are in Normal Commercial Use, and Therefore Are Not Components Included on the Munitions List Under Category XI(c)**

The i960 MC microprocessor, designed and manufactured by Intel in the early 1990s, is

part of a family of "i960" processors.  All of the i960 processors (also referred to as "80960"

processors) are 32-bit RISC-based microprocessors which are suitable for a variety of embedded

applications including printers, input-output ("I/O") controllers, and communications devices.[19]

---

Headquarters Rulings HQ 962750 (Jan. 10, 2000) (AMD 80386-40 32-bit embedded microproc-essor); HQ 963262 (Jan. 10, 2000) (Intel PP 100 CPU); *see also* Customs Classification Ruling NY 816081 (Nov. 9, 1995) (Intel "P6" 32-bit microprocessor classified under HTSUS 8542.11.8078, "Electronic integrated circuits and micro assemblies; parts thereof: Monolithic integrated circuits: Digital, Other ....").

[19] "Intel® 80960 Value Processors," *available at* www.intel.com/design/i960/value.htm. (Ex. E).

- 18 -

Intel's datasheet for the i960 MC describes it as a multipurpose processor suited for a variety of embedded applications:

> The Intel® 80969MC, a member of the Intel i960® 32-bit processor family, is ideally suited for embedded applications. It includes a 512-byte instruction cache and a built-in interrupt controller. The 80960MC has a large resister set, multiple parallel execution units and a high-bandwidth burst bus. Using advanced RISC technology, this processor is capable of execution rates in excess of 9.4 million instructions per second. **The 80960MC is well suited for a wide range of applications including non-impact printers, I/O control and specialty instrumentation. The embedded market includes applications as diverse as industrial automation, avionics, image processing, graphics and networking.**[20]

The i960 family was discontinued by Intel in the 1990s, but it continues to be manufactured under Intel license by Rochester Electronics Inc. *See* SI at 20 ¶ 6.

The defense expects the evidence at trial to show that the i960 MC was a dual use item that had significant civil and commercial applications, and thus was "in normal commercial use" within the meaning of Munitions List Category XI(c). Because the i960 MC is an electronic "component," Cat. XI(c), not "computer," 22 C.F.R. § 121.1, Cat. XI(a)(6), and because it is "in normal commercial use" within the exception to Category XI(c), it is not a designated Munitions List item, and thus is not subject to the AECA.[21]

### C.    The Superseding Indictment's Silence Regarding the "Normal Commercial Use" of the i960 MC Renders Those Counts Insufficient to State an Offense

Because the evidence on the use of the i960 MC is not undisputed (as it is with regard to the capacitors), Counts Ten through Twelve are not yet ripe for dismissal for insufficiency of the

---

[20] 80960MC datasheet § 1.0, *available at* http://download.intel.com/design/i960/datashts/27312302.PDF (excerpt attached as Ex. C) (emphasis added).

[21] Intel, the original designer and manufacturer of the i960 MC, has never classified the i960MC as a defense article subject to ITAR or Munitions List control. (It is common for manufacturers with export compliance programs, such as Intel, to self-classify their manufactured items under the ITAR. *See* "Commodity Jurisdiction FAQs," Ex. A.)

evidence. *Yakou*, 428 F.3d at 246-47. But the fact that they allege conduct which is legal if the i960 MC was in normal commercial use means that those Counts fail to state an offense.

As explained in Section IV.A, *supra*, the i960 MC chip is at most a "component" under Munitions List Category XI(c), not a "computer" under Category XI(a)(6). It thus is subject to the "normal commercial use" exception under Category XI(c). Again, under 22 C.F.R. § 120.3, the question is not whether *these particular* microprocessors were in normal commercial use, because the intended end-use of the particular items exported does not determine whether they are on the Munitions List. § 120.3; "Commodity Jurisdiction FAQs," Ex. A (quoted *supra* at 9-10). Instead, the question is whether the i960 MC processor *generally* was in "normal commercial use"—that is, was a substantial number of i960 MC processors put into civil or commercial applications? The evidence will show that they were, and that the i960 MC therefore was not listed on the Munitions List, and its exportation was not illegal under the AECA.

The indictment's silence in Counts Ten through Twelve regarding whether the i960 MC was in "normal commercial use" means that the government could prove all of the facts alleged in the indictment with respect to the i960 MC chips, and still not prove they were on the Munitions List, or that they were unlawfully exported under the AECA. Because the i960 MC allegations in Counts Ten through Twelve "may be true, and still the accused may not be guilty of that offense, the indictment is insufficient." *Moens*, 267 F. at 322 (citation omitted); *see also* Section I.B, *supra*. Counts Ten through Twelve must therefore be dismissed for failure to state an offense.

Respectfully submitted,

/s/  William T. Hassler
Reid H. Weingarten (D.C. Bar #365893)
William T. Hassler (D.C. Bar #366916)
Robert A. Ayers (D.C. Bar # 488284)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

*Counsel for Defendant Parthasarathy Sudarshan*

November 15, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 07-0051 (RMU)** |
| | ) | |
| **PARTHASARATHY SUDARSHAN,** | ) | |
| *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of Defendant Parthasarathy Sudarshan's Motion To Dismiss Counts Ten through Fourteen, the Government's Opposition and Defendant's Reply thereto, it is HEREBY ORDERED that Defendant's motion is GRANTED.  Counts Thirteen, Fourteen, and so much of Count Ten as concerns the capacitors alleged in Counts Thirteen and Fourteen are DISMISSED WITH PREJUDICE for insufficiency of the evidence, *see United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) [or, in the alternative, are DISMISSED WITHOUT PREJUDICE for failure to state an offense].  Counts Eleven, Twelve, and so much of Count Ten as concerns the i960 MC microprocessors alleged in Counts Eleven and Twelve are DISMISSED WITHOUT PREJUDICE for failure to state an offense.

SO ORDERED.

_____
Ricardo M. Urbina
UNITED STATES DISTRICT JUDGE

copies to:

Jay I. Bratt
Assistant United States Attorney
National Security Section
555 Fourth Street, NW
Washington, D.C.  20530

Reid H. Weingarten
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795

Anjali Chaturvedi
Nixon Peabody, LLP
401 9th Street, NW
Suite 900
Washington, DC  20004-2128

# EXHIBIT A

# Commodity Jurisdiction (CJ) FAQs

**Q:  Is my item controlled on the U.S. Munitions List (Department of State) or the Commerce Control List (Department of Commerce)?**

A:  The Directorate of Defense Trade Controls (DDTC) cannot provide a definitive answer without undertaking a Commodity Jurisdiction (CJ) review of your item and making an official CJ determination.  However, most manufacturers are able to self-classify their items by reviewing International Traffic in Arms Regulations (ITAR) §§120.2, 120.3, and 120.4 (which relate to the CJ process) and ITAR §121.1 (the U.S. Munitions List or USML).  It is important to review all of these sections since some items that could be considered civil (e.g., hunting rifles and commercial satellites) are captured on the USML for export purposes.  If, after reviewing the pertinent sections of the ITAR, you still are not sure if your item is controlled on the USML, then submit a CJ request.  Guidelines for submitting the CJ request can be found online at http://www.pmddtc.state.gov/reference.htm under the "Commodity Jurisdiction" header.

**Q:  Does our company need to register prior to the submission of a CJ request?**

A:  Registration with DDTC is NOT required prior to submission of a CJ request.

**Q:  Who can submit a CJ request?**

A:  We prefer that the manufacturer submit the request because of the background and sales information required.  However, a designated representative may submit a CJ request on the manufacturer's behalf.  In such cases, the CJ request package must include a letter of authorization from the manufacturer on company letterhead signed by a company official, a mailing address, and phone number.

**Q:  I am selling my civil item to a foreign military.  Does this make it USML and do I need an export license from State?**

A:  You do not need an export license from DDTC if your item is not controlled on the USML.  That remains true even if you are selling the item to a foreign military. The end-user does not determine export jurisdiction.

**Q:  How long does it take to get a CJ determination?**

A:  It varies depending on the complexity of the request and the recommendations of the reviewing agencies.  Our goal is to complete CJ requests in 60 days. However, for the first six months of 2007, median processing time of completed Commodity Jurisdiction determinations was 106 days.

**Q:  Has there been a change regarding export jurisdiction for L-100/C-130 spare parts?**

A:  Please go to www.pmddtc.state.gov/aircraft_parts.htm for an announcement on this subject.  Included on this page is the relevant **Federal Register** notice and common Q's and A's on the topic.

# EXHIBIT B

U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

October 31, 2007

## BY HAND DELIVERY AND ELECTRONIC MAIL

Reid H. Weingarten, Esq.
William T. Hassler, Esq.
Robert Ayres, Esq.
Steptoe & Johnson
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795

Re:     United States v. Parthasarathy Sudarshan, Cr. No. 07-051 (RMU)

Dear Counsel:

We are writing in response to your discovery letter dated October 5, 2007 (the "Letter").

Redacted

Redacted

<u>Information from the Department of Commerce and the Department of State</u>

In paragraphs 13 through 18 on page 5 of the Letter, you seek information from the State Department and the Department of Commerce pertaining to the Intel i960MC microprocessor and
the ceramic capacitors described in counts 10 through 14 of the indictment. The government does not agree that these requests relate to information that the government must produce either pursuant to Rule 16 or <u>Brady</u>. Nevertheless, without waiving its objection to these requests or to requests for similar types of information in the future, the government provides the following response. First, the State Department has never processed a commodity jurisdiction request or government jurisdiction request for any of the items described in counts 10 through 14. Nor has the State Department issued any licenses in the past for exports of these commodities. The Department of Commerce is still researching whether it has processed any commodity classification requests for these products and whether it has issued any licenses for the goods. Once we get a response from the Department of Commerce, we will provide you with the information that we receive.

Redacted

-3-

Redacted

Pursuant to Rule 16(a)(1)(G), Fed. R. Crim. P., the government also gives notice that, at trial, it may call Xay Vang as an expert witness. Mr. Vang, an engineer with the Defense Technology Security Administration of the Department of Defense, analyzed the i960MC microprocessor and the ceramic capacitors for purposes of determining whether these items are on the United States Munitions List. Copies of Mr. Vang's résumé and biography are enclosed.

Mr. Vang would testify that, based on the product specifications for the i960MC microprocessor and his research into the applications of the product, and using the criteria set forth in Part 120 of the ITAR, he determined that the i960MC microprocessor is a computer within the meaning of Category XI(a)(6). He would state that the i960MC is the military version of the i960 embedded processor family designed specifically to meet military embedded applications such as avionics, aerospace, weapons systems, robotics, and instrumentation, where high reliability, integration, and performance are critical. In particular, Mr. Vang would testify that the i960MC microprocessor is identical to the i960 microprocessor that the United States Air Force uses in the F-22, except that three pins in the i960MC have been disabled so that the microprocessor cannot perform certain functions that are unique to the F-22. According to Mr. Vang, the i960MC microprocessor is designed to function even if exposed to 10 "g" forces and at

-4-

an altitude of 50,000 feet. These are purely military applications. The i960MC microprocessor is further designed so that it can process a million bits of information without error. This is crucial to the functioning of a military aircraft under military conditions, because, if there is even a single bit of error in the microprocessor, the aircraft will crash or its weapons systems will malfunction. Mr. Vang would further testify that the i960MC microprocessor is the "brains" of the aircraft. It processes all of the binary digits that are crucial to the operation of the plane. In particular, it processes all of the sensor information. If the processing of sensor data is not operating properly, the aircraft will not know where it is and will crash.

Mr. Vang would also testify that, based on the product specifications for the ceramic capacitors and his research into the applications of those items, and using the criteria set forth in Part 120 of the ITAR, he determined that the ceramic capacitors are components, parts, accessories, attachments, and associated equipment for military electronic equipment within the meaning of Category XI(c).[4] Mr. Vang would further testify that the ceramic capacitors are designed for military applications such as solid state magnetrons, avionics, missiles, radar systems, traveling wave tube power amplifiers, military radio equipment, electromagnetic guns, and military and power lasers. Mr. Vang would describe the ceramic capacitors as temporary electrical storage units that store protons and electrons and continuously release them. According to Mr. Vang, the ceramic capacitors are designed so that they will continue to store and discharge electricity in an airborne environment. Like the i960MC microprocessors, the ceramic capacitors are designed to function when exposed to up to 10 "g" forces and at an altitude of 50,000 feet.

To the extent that there was language in the indictment that may have suggested that the State Department relied on the end-use of the i960MC microprocessors in the Tejas Light Combat Aircraft and on the end-use of the ceramic capacitors in missiles manufactured by the Vikram Sarabhai Space Centre in concluding that these commodities are on the Munitions List, the government has removed that language from the indictment. In classifying these items as defense articles, the State Department and Mr. Vang did so according to the criteria set forth in the regulations. Any arguable imprecision in the language of the original indictment is attributable to government counsel, not to the State Department.

---

[4] In his research on the ceramic capacitors, Mr. Vang noted that the manufacturers of the products identified them as having 87% military applications and only 17% civil applications.

Please let us know if you have any questions about the information provided above.

Very truly yours,

Jay I. Bratt
Assistant United States Attorney
(202) 353-3602

Anthony Asuncion
Assistant United States Attorney
(202) 514-6950

Enclosures

–6–

# EXHIBIT C

intel.

# 80960MC
## EMBEDDED 32-BIT MICROPROCESSOR
## WITH INTEGRATED FLOATING-POINT UNIT
## AND MEMORY MANAGEMENT UNIT
### *Commercial*

- **High-Performance Embedded Architecture**
  - 25 MIPS Burst Execution at 25 MHz
  - 9.4 MIPS* Sustained Execution at 25 MHz
- **On-Chip Floating Point Unit**
  - Supports IEEE 754 Floating Point Standard
  - Full Transcendental Support
  - Four 80-Bit Registers
  - 13.6 Million Whetstones/s (Single Precision) at 25 MHz
- **512-Byte On-Chip Instruction Cache**
  - Direct Mapped
  - Parallel Load/Decode for Uncached Instructions
- **Multiple Register Sets**
  - Sixteen Global 32-Bit Registers
  - Sixteen Local 32-Bit Registers
  - Four Local Register Sets Stored On-Chip (Sixteen 32-Bit Registers per Set)
  - Register Scoreboarding

- **On-Chip Memory Management Unit**
  - 4 Gbyte Virtual Address Space per Task
  - 4 Kbyte Pages with Supervisor/User Protection
- **Built-in Interrupt Controller**
  - 32 Priority Levels
  - 248 Vectors
  - Supports M8259A
  - 3.4 $\mu$s Latency @ 25 MHz
- **Easy to Use, High Bandwidth 32-Bit Bus**
  - 66.7 Mbytes/s Burst
  - Up to 16 Bytes Transferred per Burst
- **Multitasking and Multiprocessor Support**
  - Automatic Task dispatching
  - Prioritized Task Queues
- **Advanced Package Technology**
  - 132-Lead Ceramic Pin Grid Array



**Figure 1. The 80960MC Processor's Highly Parallel Architecture**

© INTEL CORPORATION, 2004          September, 2004          **Order Number:** 273123-002

Information in this document is provided in connection with Intel products. No license, express or implied, by estoppel or otherwise, to any intellectual property rights is granted by this document. Except as provided in Intel's Terms and Conditions of Sale for such products, Intel assumes no liability whatsoever, and Intel disclaims any express or implied warranty, relating to sale and/or use of Intel products including liability or warranties relating to fitness for a particular purpose, merchantability, or infringement of any patent, copyright or other intellectual property right. Intel products are not intended for use in medical, life saving, or life sustaining applications. Intel may make changes to specifications and product descriptions at any time, without notice. Contact your local Intel sales office or your distributor to obtain the latest specifications and before placing your product order.

Intel retains the right to make changes to specifications and product descriptions at any time, without notice.

*Third party brands and names are the property of their respective owners.

Copies of documents which have an ordering number and are referenced in this document, or other Intel literature, may be obtained from:

Intel Corporation
P.O. Box 7641
Mt. Prospect IL 60056-7641
or call 1-800-879-4683

Many documents are available for download from Intel's website at http://www.intel.com

Copyright © Intel Corporation 1997

**int̲el̲**®                                                                  80960MC

1.0 **THE i960® MC PROCESSOR** ....................................................................................................... 1

   1.1 Key Performance Features ........................................................................................................ 2

      1.1.1 Memory Space And Addressing Modes ........................................................................ 4

      1.1.2 Data Types ..................................................................................................................... 4

      1.1.3 Large Register Set ......................................................................................................... 4

      1.1.4 Multiple Register Sets .................................................................................................... 5

      1.1.5 Instruction Cache ........................................................................................................... 5

      1.1.6 Register Scoreboarding .................................................................................................. 5

      1.1.7 Memory Management and Protection .............................................................................. 6

      1.1.8 Floating-Point Arithmetic ................................................................................................ 6

      1.1.9 Multitasking Support ....................................................................................................... 7

      1.1.10 Synchronization and Communication ........................................................................... 7

      1.1.11 High Bandwidth Local Bus ........................................................................................... 7

      1.1.12 Multiple Processor Support ........................................................................................... 7

      1.1.13 Interrupt Handling ......................................................................................................... 8

      1.1.14 Debug Features ............................................................................................................ 8

      1.1.15 Fault Detection .............................................................................................................. 8

      1.1.16 Inter-Agent Communications (IAC) ............................................................................... 9

      1.1.17 Built-in Testability ......................................................................................................... 9

      1.1.18 Compatibility with 80960K-Series ................................................................................ 9

      1.1.19 CHMOS .......................................................................................................................... 9

2.0 **ELECTRICAL SPECIFICATIONS** .............................................................................................. 13

   2.1 Power and Grounding .............................................................................................................. 13

   2.2 Power Decoupling Recommendations ...................................................................................... 13

   2.3 Connection Recommendations ................................................................................................ 13

   2.4 Characteristic Curves .............................................................................................................. 13

   2.5 Test Load Circuit ..................................................................................................................... 16

   2.7 DC Characteristics ................................................................................................................... 17

   2.6 Absolute Maximum Ratings ..................................................................................................... 17

   2.8 AC Specifications ..................................................................................................................... 18

   2.9 Design Considerations ............................................................................................................. 22

3.0 **MECHANICAL DATA** ................................................................................................................. 22

   3.1 Packaging ................................................................................................................................ 22

      3.1.1 Pin Assignment ............................................................................................................. 22

   3.2 Pinout ...................................................................................................................................... 26

   3.3 Package Thermal Specification ................................................................................................ 28

4.0 **WAVEFORMS** ............................................................................................................................. 30

5.0 **REVISION HISTORY** ................................................................................................................... 35

80960MC

**intel**®

## FIGURES

Figure 1.    80960MC Programming Environment ................................................................. 1
Figure 2.    Instruction Formats ................................................................................... 4
Figure 3.    Multiple Register Sets Are Stored On-Chip ................................................. 6
Figure 4.    Connection Recommendations for Low Current Drive Network ...................... 13
Figure 5.    Connection Recommendations for High Current Drive Network ..................... 13
Figure 6.    Typical Supply Current vs. Case Temperature ............................................. 14
Figure 7.    Typical Current vs. Frequency (Room Temp) .............................................. 14
Figure 8.    Typical Current vs. Frequency (Hot Temp) .................................................. 15
Figure 9.    Worst-Case Voltage vs. Output Current on Open-Drain Pins ........................ 15
Figure 10.   Capacitive Derating Curve ........................................................................ 15
Figure 11.   Test Load Circuit for Three-State Output Pins ............................................ 16
Figure 12.   Test Load Circuit for Open-Drain Output Pins ............................................ 16
Figure 13.   Drive Levels and Timing Relationships for 80960MC Signals ....................... 18
Figure 14.   Timing Relationship of L-Bus Signals ....................................................... 19
Figure 15.   System and Processor Clock Relationship ................................................. 19
Figure 16.   Processor Clock Pulse (CLK2) ................................................................... 21
Figure 17.   RESET Signal Timing ................................................................................ 21
Figure 18.   HOLD Timing ........................................................................................... 22
Figure 19.   132-Lead Pin-Grid Array (PGA) Package ..................................................... 23
Figure 20.   80960MC PGA Pinout—View from Bottom (Pins Facing Up) ......................... 24
Figure 21.   80960MC PGA Pinout—View from Top (Pins Facing Down) ........................... 25
Figure 22.   25 MHz Maximum Allowable Ambient Temperature ..................................... 29
Figure 23.   Non-Burst Read and Write Transactions Without Wait States ....................... 30
Figure 24.   Burst Read and Write Transaction Without Wait States ............................... 31
Figure 25.   Burst Write Transaction with 2, 1, 1, 1 Wait States ..................................... 32
Figure 26.   Accesses Generated by Quad Word Read Bus Request, Misaligned Two Bytes from
             Quad Word Boundary (1, 0, 0, 0 Wait States) ............................................. 33
Figure 27.   Interrupt Acknowledge Transaction ........................................................... 34
Figure 28.   Bus Exchange Transaction (PBM = Primary Bus Master, SBM = Secondary Bus Master) ..... 35

## TABLES

Table 1.    80960MC Instruction Set .......................................................................... 3
Table 2.    Memory Addressing Modes ....................................................................... 4
Table 3.    Sample Floating-Point Execution Times (µs) at 25 MHz ............................... 7
Table 4.    80960MC Pin Description: L-Bus Signals .................................................... 9
Table 5.    80960MC Pin Description: Support Signals ................................................. 11
Table 6.    DC Characteristics ................................................................................... 17
Table 7.    80960MC AC Characteristics (25 MHz) ....................................................... 20
Table 8.    80960MC PGA Pinout — In Pin Order ......................................................... 26
Table 9.    80960MC PGA Pinout — In Signal Order ..................................................... 27
Table 10.   80960MC PGA Package Thermal Characteristics ......................................... 28

**intel.**                                                                    **80960MC**

## 1.0    THE i960® MC PROCESSOR

The 80960MC, a member of Intel's i960® 32-bit processor family, is ideally suited for embedded applications. It includes a 512-byte instruction cache and a built-in interrupt controller. The 80960MC has a large register set, multiple parallel execution units and a high-bandwidth burst bus. Using advanced RISC technology, this processor is capable of execution rates in excess of 9.4 million instructions per second*. The 80960MC is well-suited for a wide range of applications including non-impact printers, I/O control and specialty instrumentation. The embedded market includes applications as diverse as industrial automation, avionics, image processing, graphics and networking. These types of applications require high integration, low power consumption, quick interrupt response times and high performance. Since time to market is critical, embedded processors must be easy to use in both hardware and software designs.

All members of the i960 processor family share a common core architecture which utilizes RISC technology so that, except for special functions, the family members are object-code compatible. Each new processor in the family adds its own special set of functions to the core to satisfy the needs of a specific application or range of applications in the embedded market.

The 80960MC includes an integrated Floating Point Unit (FPU), a Memory Management Unit (MMU), multitasking support, and multiprocessor support. Two commercial members of the i960® family provide similar features: the 80960KB processor with integrated FPU and the 80960KA without floating-point.

---
\* Relative to Digital Equipment Corporation's VAX-11/780* at 1 MIPS



**Figure 1.  80960MC Programming Environment**

1

80960MC

**intel.**

## 1.1    Key Performance Features

The 80960 architecture is based on the most recent advances in microprocessor technology and is grounded in Intel's long experience in the design and manufacture of embedded microprocessors. Many features contribute to the 80960MC's exceptional performance:

1. **Large Register Set.** Having a large number of registers reduces the number of times that a processor needs to access memory. Modern compilers can take advantage of this feature to optimize execution speed. For maximum flexibility, the 80960MC provides thirty-two 32-bit registers. (See Figure 2.)

2. **Fast Instruction Execution.** Simple functions make up the bulk of instructions in most programs so that execution speed can be improved by ensuring that these core instructions are executed as quickly as possible. The most frequently executed instructions such as register-register moves, add/subtract, logical operations and shifts execute in one to two cycles. (Table 1 contains a list of instructions.)

3. **Load/Store Architecture.** One way to improve execution speed is to reduce the number of times that the processor must access memory to perform an operation. As with other processors based on RISC technology, the 80960MC has a Load/Store architecture. As such, only the LOAD and STORE instructions reference memory; all other instructions operate on registers. This type of architecture simplifies instruction decoding and is used in combination with other techniques to increase parallelism.

4. **Simple Instruction Formats.** All instructions in the 80960MC are 32 bits long and must be aligned on word boundaries. This alignment makes it possible to eliminate the instruction alignment stage in the pipeline. To simplify the instruction decoder, there are only five instruction formats; each instruction uses only one format. (See Figure 3.)

5. **Overlapped Instruction Execution.** Load operations allow execution of subsequent instructions to continue before the data has been returned from memory, so that these instructions can overlap the load. The 80960MC manages this process transparently to software through the use of a register scoreboard. Conditional instructions also make use of a scoreboard so that subsequent unrelated instructions may be executed while the conditional instruction is pending.

6. **Integer Execution Optimization.** When the result of an arithmetic execution is used as an operand in a subsequent calculation, the value is sent immediately to its destination register. Yet at the same time, the value is put on a bypass path to the ALU, thereby saving the time that otherwise would be required to retrieve the value for the next operation.

7. **Bandwidth Optimizations.** The 80960MC gets optimal use of its memory bus bandwidth because the bus is tuned for use with the on-chip instruction cache: instruction cache line size matches the maximum burst size for instruction fetches. The 80960MC automatically fetches four words in a burst and stores them directly in the cache. Due to the size of the cache and the fact that it is continually filled in anticipation of needed instructions in the program flow, the 80960MC is relatively insensitive to memory wait states. The benefit is that the 80960MC delivers outstanding performance even with a low cost memory system.

8. **Cache Bypass.** When a cache miss occurs, the processor fetches the needed instruction then sends it on to the instruction decoder at the same time it updates the cache. Thus, no extra time is spent to load and read the cache.

2

# EXHIBIT D

# i960® Microprocessor Family Networking Application

PRODUCT
HIGHLIGHTS

**Maximum amount of processing per packet without clogging data flow**

- ■ **Superscalar architecture executes multiple instructions per clock**

- ■ **Up to 16-Kbyte of instruction cache and 4-Kbyte of data cache keep external accesses to a minimum**

**Move network data with lightning speed**

- ■ **Pipelined burst bus with prefetch processor provides 132-Mbytes/ second bandwidth to high speed external memory subsystem**

- ■ **128-bit internal data paths**

- ■ **Unaligned big endian features**

**Guaranteed maximum performance for critical protocols/routines**

- ■ **Cache locking feature keeps critical algorithms in the internal instruction cache**



## OVERVIEW

The i960® microprocessor family is ideally suited for today's high performance networking applications. High peripheral integration reduces system complexity and speeds time-to-market. There are fourteen commercial implementations of the i960 architecture available to meet the price and performance requirements of network designers. The i960 architecture is supported by more than 200 independent hardware and software vendors to assist in the development process.

The new Mini-PBGA package available with the i960 Jx processor series is outstanding wherever high performance, small form factor requirements are needed. The Mini-PBGA package enables higher port densities for space constrained applications such as remote access equipment.

Intel offers the world's most advanced RISC compiler technology that can increase application performance by as much as 45 percent. These new compilers use profile information collected during execution of the application code to streamline it for optimum performance. The compiler supports both the little endian and big endian data formats of the i960 processors.



## BENEFITS OF THE i960® ARCHITECTURE IN NETWORKING APPLICATIONS

**Amortize engineering investment from network interface cards to bridges/routers**

■ **Scalable architecture based on a common instruction set and programming model allows software investment to be moved to another i960® processor with higher performance and integration**

■ **i960 SA processor provides 7 MIPS performance for under $10 for terminal servers of network interface cards**

■ **i960 Jx and Hx processors offer high levels of embedded RISC performance for demanding applications such as bridges and routers**

**Register set is ideally suited for bridge/router applications**

■ **16 global and 16 local registers allow for storage of frequently used variables**

■ **On-chip register cache minimizes call/return latency**

**Maximum memory utilization**

■ **Pipelined burst bus with prefetch processor provides 132-Mbytes/second bandwidth to high speed external memory subsystem**

**i960 Microprocessor family reduces system cost**

■ **Family members feature integrated interrupt controller and memory control unit eliminating the need for additional support chips**

**Peripheral chips and software solutions provide for cost-effective networking solutions**

■ **National SONIC Ethernet coprocessor**

■ **Brooktree Bt8220 ATM receiver/transmitter**

■ **Brooktree UGA-210 SMDS control and reassembly formatter**

■ **Router engine iFX780 FLEXlogic FPGA DRAM controller**

■ **STAC LZS221-960 lossless compression software**

| Intel Reference Numbers | |
|---|---|
| World Wide Web Address: | http://developer.intel.com/ |
| FaxBack System: | 1 (800) 525-3019 or (503) 264-6835 |
| Application Bulletin Board System: | 1 (916) 356-3600 |
| Intel Literature Center: | 1 (800) 548-4725 7 a.m. to 7 p.m. CST |
| Retail PC and Network Products: | 1 (800) 538-3373 or (503) 629-7000  7 a.m. to 7 p.m. PST |
| General Information Hotline: | 1 (800) 628-8686 & (916) 356-3104  5 a.m. to 5 p.m. PST |

Intel Corporation assumes no responsibility for the use of any circuitry other than circuitry embodied in an Intel product. No other circuit patent licenses are implied. Information contained herein supercedes previously published specifications on these devices from Intel.

For more information, contact Intel's World Wide Web Site at http://developer.intel.com/
*Third-party marks and names are the property of their respective owners.
©Intel Corporation 1998

✿ Printed on Recycled Paper
Order Number 272217-004
Printed in U.S.A./0398/5K/IL0367 GA

# EXHIBIT E

Home › Products › Embedded & Flash Memory › i960® Processors ›

## Products

- Processors ›
- Chipsets ›
- Flash Memory ›
- Microcontrollers ›
- Ethernet Products ›
- RFID
- Development Kits

# Intel® 80960 Value Processors

**These products have been discontinued by Intel. The documents are p
historical reference purposes only.**

The i960® Sx Processor Series | The i960® Kx Processor Series
|
The i960® MC Processor Series

**Product Inf**

### Product Highlights
**i960® SA/SB, i960® KA/KB, and i960® MC
Processors**

- High performance 32-bit embedded architecture
- 512-byte direct mapped instruction cache
- Multiple register sets with register scoreboarding
- Built-in interrupt controller
- Multiplexed bus
- Built-in IEEE 754 compatible floating point unit
  (i960 SB/KB processors only)
- 4 Gigabyte, linear address space (i960 KA/KB only)
- High-speed 16-bit burst data bus
  (i960 SA/SB processors only)
- PB free package

**Product Inf**

- FAQs
- Technical Doc
- i960® Pro
  Brief
- i960® MC
- i960® Kx F


Where

Note: All speeds are not available in all package types. For an active product
here.

| Device | Speed (MHz) | 3.3 Volt Op. | Data Bus Width | Instruction Cache | Data Cache | Data RAM | Time |
|--------|-------------|--------------|----------------|-------------------|------------|----------|------|
| 80960KA | 25, 20, 16 | No | 32 | 512 Kbytes | No | No | No |
| 80960KB | 25, 20, 16 | No | 32 | 512 Kbytes | No | No | No |
| 80960MC | 25 | No | 32 | 512 Kbytes | No | No | No |
| 80960SA | 20, 16, 10 | No | 16 | 512 Kbytes | No | No | No |
| 80960SB | 16, 10 | No | 16 | 512 Kbytes | No | No | No |

i960® processors with extended temperature packaging.

Marketing Package Designator

### The i960® Sx Processor Series
With full 32-bit internal architecture and a 16-bit external bus, the i960® SA/
offer a cost-effective solution for designers of embedded applications. Althoug
level of the i960® architecture family, these processors are ideal for demandi
such as entry-level page printers, I/O controllers, games and communications
integrated burst control reduces bus bottlenecks, and the powerful 32-bit CPU
throughput. The high level of integration minimizes chip count to lower overa

**The i960® Kx Processor Series**

The i960® KA/KB processors were introduced over 12 years ago as the first r
i960 32-bit microprocessor family. They are based on the family's high perfor
common core architecture and are capable of execution rates in excess of 9.4
of Instructions Per Second). The i960 KA/KB processors are well-suited for en
applications such as page printers, image processing, industrial control, robot
telecommunications products.

**The i960® MC Processor Series**

The Intel® 80960MC, a member of the Intel i960® 32-bit processor family, is
for embedded applications. It includes a 512-byte instruction cache and a bui
controller. The 80960MC has a large resister set, multiple parallel execution u
high-bandwidth burst bus. Using advanced RISC technology, this processor is
execution rates in excess of 9.4 million instructions per second. The 80960MC
for a wide range of applications including non-impact printers, I/O control and
instrumentation.

The i960® Kx and Sx series and the i960® MC processor are code-compatible
entire i960 architecture family of microprocessors, enabling an easy growth p
performance while protecting software investment.